UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EL DORADO IRRIGATION DISTRICT,
a political subdivision of the
State of California,

           Plaintiff,

    v.

TRAYLOR BROS., INC., an
Indiana corporation,

           Defendant.
_____/

AND RELATED COUNTER-CLAIMS.
_____/

NO. CIV. S-03-949 LKK/GGH

O R D E R

    Pending before the court are three motions for summary adjudication.  As I explain below, like everything in this case, the motions are complex, and the resolution less than perfectly straight-forward.

    The first motion is filed by Traylor Brothers, Inc. ("TBI"). It seeks to have certain damages claimed by plaintiff, El Dorado Irrigation District ("EID"), denied on the grounds that the

1

contract expressly limits the collection of "delay damages" to the liquidated amount of $500 per day.  Plaintiff opposes this motion on the ground that the damages which they are seeking do not fall under the delay damages provision of the contract, because rather than delay damages, they are damages incurred by virtue of the need to correct defective work performed by defendant and to complete the project.

The second and third motions are cross-motions for summary adjudication on plaintiff's False Claims Act and fraud causes of action.  Defendant argues that it never submitted anything to the plaintiff which meets the definition of a false claim under the Act, while plaintiff points to what they assert are false claims made to it in the form of monthly billing statements.

## I.

## FACTS[1]

**A.   FACTS IN SUPPORT OF DELAY DAMAGES CLAIM**

The Contract contains the following liquidated damages provisions:

General Provisions

ART 18 – LIQUIDATED DAMAGES

> A.   It is understood and agreed by the parties that damages for Contractor delay are expensive to litigate and difficult to ascertain.  Therefore, it is agreed that as and for a separately bargained for liquidated damage, and not as a penalty, the District [EID] shall

---

[1]   The facts stated in the text are undisputed unless otherwise noted.  EID improperly submitted a separate statement of undisputed facts with its reply, which the court will not formally consider.  See Local Rule 56-260(b) and (f).

deduct or recover the amount set for the in the Contract Agreement unless extensions of time granted by Owner specifically provide for the waiving of liquidated damages.

Special Provisions

§18.11    Liquidated Damages/Bonus:  If the Project is not Substantially Completed by Contractor and fully operational within the Contract Time, or within any period of extension authorized pursuant to section 8.10 or pursuant to a duly issued Change Order, Contractor acknowledges and admits that EID will suffer damages and that it is impracticable and infeasible to fix the amount of actual damages.  Therefore, it is agreed by and between Contractor and EID that Contractor shall pay to EID, as fixed and liquidated damages and not as a penalty, Five Hundred Dollars ($500) for each calendar day of delay until the Project is Substantially Completed and fully operational, and that both Contractor and Contractor's surety shall be liable for the total amount thereof, and that EID may deduct said sums from any moneys due or that may become due to Contractor.  If liquidated damages begin to accrue prior to the time for final payment, the amount accrued shall be withheld from any progress payment that would otherwise be due, in addition to any Project extension.

This liquidated damages provision shall apply to all delays or any nature whatsoever, save and except only delays found to be Excusable or Compensable pursuant to section 8.10, herein above, or time extensions granted by EID.

Agreement between EID and TBI, dated Nov. 1, 1999.

EID seeks to enforce the above-quoted liquidated damages term, asserting it is entitled to liquidated damages in the amount of $191,000.00.  Compl., dated Apr. 7, 2003; EID's Initial and Supplemented Rule 26 Disclosure Statements Section C.1 (g).

EID also seeks to recover sums paid to various companies as follows:

1.    $1,538,313.00 for MWH's extended project management services beyond the contractual completion date;

3

1     2.   $252,485.00 for EN2's extended environmental

2 monitoring services; and

3     3.   $1,571,888.00 for HPT's extended water treatment

4 services.

5     It also seeks to recover $1,901.333.00 in public grant funds

6 lost allegedly due to delay in completion of the project.

7 EID's Initial and Supplemented Rule 26 Disclosure Statements,

8 Section C.1.(a), (b), (c) and (h).

9     TBI alleged as a Sixteenth Affirmative Defense that the

10 damages specified above are barred because they are delay damages.

11 Answer and Countercl. for Declaratory Relief, dated May 12, 2003.

12 **B.   FACTS IN SUPPORT OF FALSE CLAIMS ACT AND FRAUD CLAIMS**

13     In November 1999, EID entered into a contract with TBI which

14 required TBI to design and build a tunnel.  Section 1 of the

15 "Agreement" portion of the contract, page 1 of Exhibit "1,"

16 specifies that TBI's Scope of Work was to "provide complete design

17 and construction for the Project commonly referred to as 'Mill-Bull

18 Tunnel and Associated Facilities,'. . . ."

19     In February of 2002, TBI wrote EID that "[w]e recognize our

20 responsibility for the [tunnel] alignment, and of course we'll

21 maintain our field books for the record."  Deposition of John

22 McDonald at 161:17-162:23, Ex. 9.  In October 2002, TBI published

23 its own "as-built" survey that shows a misalignment of the tunnel

24 graphically and tabularly.[2]

25 

26     [2] This survey constitutes an admission as to the
misalignment, since TBI prepared it, and in his deposition TBI's

1    TBI's Project Manager, John McDonald, testified at deposition

2    that the as-built tunnel exceeded the contract design tolerances

3    "by a wide margin" and that TBI did not follow the line and grade

4    specified in the contract.  McDonald Dep. at 105:18-107:9.[3]  He

5    further testified that the contract required the tunnel excavation

6    to be done in a straight line.  Id. at 103:10-105:16.

7    The Contract provides that TBI could earn a Guaranteed Maximum

8    Price ("GMP") of $11,280,960, which included a fixed "Contractor's

9    Fee" of $789,940 (essentially a profit) and 'TBI's Cost of the Work

10   up to a maximum of $10,491,020.  See Section 5 of the Agreement to

11   the Contract and see Mitteer Dec. at ¶ 7.

12   The contract also provides that:

13   > 7.1    Owner shall make interim progress payments
>    in accordance with the Schedule of Values and the
14   > General Conditions in an amount equal to 90 percent of
>    the value of work completed during the month, with the
15   > remaining percentage, if any, to be disbursed at final
>    payment in accordance with the General Conditions.
16   > Contractor's applications for payment shall be submitted
>    on the 25th of the month and, provided that the
17   > application is timely and complete, and is accompanied
>    by the required waiver and release forms, payment shall
18   > be made by the 10th day of the following month.

19

20

21   _____

22   Project manager, John McDonald, authenticated it and described the
circumstances of its preparation.  McDonald Dep. at 99-103, Ex. 4.

23   [3]   The Contract Drawings at Drawing No. MB-10 show the
straight line and 0.07% grade for the Tunnel with tolerances
24   established in Drawing MB-2, Note 8, of 6" vertical and 2'
horizontal. Contract, Drawing, Drawing MB-10, "Tunnel Plan and Profile",
25   attached to Ex. 5 of Decl. of Waddell; Dep. of McDonald at 384-385.
(TBI disputes that the design documents were properly incorporated
26   into the contract.)

14.01      A.  Prior to submitting the first application for a progress payment, Contractor shall have obtained approval of the progress schedule, the schedule of shop drawing submission and the schedule of values of the Work.   These schedules shall be satisfactory in form and substance to Engineer.   The unit prices and lump sum component of the bid submittal will subdivide the Work into component parts in sufficient detail to serve as the basis for progress payments during construction.   Upon acceptance of the schedule of values by Engineer, it shall be incorporated into a form of application for partial payment acceptable to Engineer.

14.03 A.    At least ten (10) days before each progress payment falls due (but not more than once a month), Contractor shall submit to Engineer for review an application for partial payment completed and signed by Contractor covering the Work completed as of the date of application and accompanied by such supporting documentation as its required by the contract documents and also as Engineer may reasonably require.   Each subsequent application for partial payment shall include an affidavit of Contractor stating that all previous payments received on account of the Work have been applied to discharge in full all of Contractor's obligations reflected in prior applications for partial payment.   The amount of retainage with respect to progress payment will be as stipulated in the Agreement.

The "schedule of values" broke the GMP into 40 line items which are discrete construction tasks or expenses; e.g., line item 24 for "tunnel excavation" broke the $3,211,844 of the GMP allocated to that task down into 10,132 units at $317/each.   The breakdown was apparently based upon the length of the Tunnel in feet.

The contract provides that if, at completion, the "Cost of the Work" plus the Contractor's fee is less than the GMP, the difference would be split between the Owner and the Contractor 50/50 (subject to an audit by the Owner of the Contractor's expenses).  Mitteer Decl., ¶ 13, Sections 5.25, 6 and 6.4.2 of the

6

1 Agreement to the Contract. "Costs and the like which would cause
2 the Guaranteed Maximum Price to be exceeded shall be paid by the
3 Contractor without reimbursement by the Owner, excepted only as set
4 out elsewhere herein."  Section 5.2.1 of the Agreement to the
5 Contract.  The Cost of the Work is to include costs incurred "in
6 repairing or correcting damaged or nonconforming Work executed by
7 the Contractor or the Contractor's Subcontractor or suppliers."
8 Mitteer Dec., ¶ 14; Section 6.1.8 of the Agreement to the Contract.

9      TBI achieved "hole through" on September 21, 2002.  Erdman
10 Dec., ¶ 4.  TBI exited the mountain too low and too far to the
11 left of the specified exit point.  McDonald Dep., Ex. 4.  Exactly
12 how much it was off is disputed, but TBI concedes that it was at
13 least five feet too low.

14      Within a few weeks, TBI and the District separately surveyed
15 the entire tunnel and confirmed that it was substantially out of
16 tolerance for most of its length.  McDonald Dep. at 99-103 & Ex.
17 4; Erdman Dec. at ¶¶ 6 and 7.  Rather than following a gradual,
18 uniform slope from upstream to downstream, the tunnel drops to the
19 approximate mid-point, where it dips to nearly 11.5 feet below the
20 design grade.  McDonald Dep. at 99-103 & Ex. 4; Erdman Dec. at
21 ¶ 8.  TBI's Project Manager testified that a line and grade
22 deviation by 2 feet or less is the maximum in the industry and the
23 9'+ deviation in this case is very unusual and something he had
24 never seen in his experience.  McDonald Dep. at 151.

25      TBI delegated sole responsibility for the alignment of the
26 tunnel to its Project Engineer, David Baddgor, who operated "pretty

1   independently" and without supervision, though he reported to John

2   McDonald.  McDonald Dep. at 134 and 369-372.  Mr. Baddgor was the

3   sole person with control over the line and grade of the machine.

4   Baddgor Dep. at 13-15; 64-67; 72-76; McDonald Dep. at 63-73; 72-73;

5   76-77; 132-134; 138-142; 151. He was responsible for performing

6   surveys and calculations in order to determine whether the bore was

7   on the proper course needed to insure that the tunnel was within

8   the contractual tolerances established by TBI's drawings.  Baddgor

9   Dep. at 13-15.  Mr. Baddgor did this through conventional survey

10  methods and calculations, and by adjusting the settings on a

11  laser-guidance device that transmitted coordinates to the Tunnel

12  boring machine operator.  Baddgor Dep. at 64-76.  Mr. Baddgor

13  testified that in April of 2002 he realized that the tunnel

14  alignment was wrong and adjusted the machine to try to bring the

15  tunnel back up to the proper place.  Baddgor Dep. at 64-72.  He

16  testified that his survey showed him that the elevation was

17  "substantially low" and that he told the TBI Superintendent, Bert

18  Dore, numerous times that they were off line and were trying to get

19  back although he did not say by how much they were off.  Baddgor

20  Dep. at 72-73, 75-76.  Two of TBI's workers in the Tunnel also

21  testified in deposition that they knew the Tunnel boring machine

22  was boring "uphill."  Rodriguez Dep. at 52:17-22; 52:23-53:6;

23  53:11-55:25; 60:2-7; Bolle Dep. at 35:21-36:5; 37:5-8; 38:13-18;

24  39:23-40:2; 41:3-13; 41:22-25; 43:14-18; 51:7-52:24.    MWH was

25  EID's Engineer.  Its employee, Mark Budwig, testified that he knew

26  the Tunnel was going uphill when he observed the water flowing in

8

1  the wrong direction.  Dec. of Mark Budwig, Ex. 21 (Erdman Dec.).

2  John McDonald acknowledged that during the Spring and Summer

3  of 2002, EID asked him for evidence of the Tunnel's alignment to

4  the contract line and grade.  McDonald Dep. at 282.  He testified

5  during this same time period the Project Engineer told him every

6  time that Mr. McDonald asked, that the Tunnel was in fact off line

7  and grade -- but Mr. McDonald claims that he never asked "by how

8  much?"  McDonald Dep. at 63-64; 72-73; 132-133.

9  After completion of Mr. Baddgor's deposition, TBI located and

10  produced Mr. Baddgor's survey book maintained during the Project,

11  and made it available at the deposition of John McDonald.  Firstman

12  Dec. at ¶ 19.  McDonald testified that if he had looked at Mr.

13  Baddgor's survey book and compared it to the contract drawings in

14  April of 2002 he would have known that the tunnel was low (by

15  roughly nine feet).  McDonald Dep. at 362-369.

16  TBI submitted a Payment Application to the District every

17  month for work that had been performed during the prior 30-day

18  period.  Erdman Dec., Exs. A-K.  Each Payment Application specified

19  the length of tunnel excavation, in linear feet, completed during

20  the previous month for which TBI sought payment.  Erdman Dec., Exs.

21  A-K.  Under the Contract, once MWH approved the Payment

22  Application, it became a representation of fact.  Contract, Gen.

23  Conditions, Section 14.05B, attached to Waddell Dec. as Ex. B.  The

24  District paid each payment application submitted between November

25  2001 and August 2002 in the amount recommended by the MWH.  Pollard

26  Dec. at ¶ 5.  No deductions were ever made to the tunnel excavation

1  request amounts on any of the payment applications.  Pollard Dec.

2  at ¶ 5; Erdman Dec. at ¶ 12.  EID paid each payment request without

3  deduction for defective tunnel excavation.  Pollard Dec. at ¶ 5.

4      The District paid the following TBI Payment applications in

5  the following amounts:

6   a.   November 2001:     $209,530.00
   b.   January 2002:      $ 33,489.00

7   c.   February 2002:    $544,039.00
   d.   March 2002:       $578,277.00

8   e.   April 2002:       $550,898.00
   f.   May 2002:        $498,096.00

9   g.   June 2002:        $526,030.00
   h.   July 2002:        $546,878.00

10  I.   August 2002:     $532,365.00

11  Pollard Dec. at ¶ 4.

12      At a project meeting on June 11, 2002, as confirmed in the Job

13  Meeting Minutes circulated to all project participants, TBI

14  informed the District that California Construction Services ("CCS")

15  was to finish a Survey check of tunnel vertical control, and that

16  the findings were to be confirmed "but preliminary report shows

17  they closed loop and matched TBI survey of tunnel alignment and

18  grade within a 1-1/4 inch."[4]  McDonald Dep. at 285-291; Ex. F to

19  Supplemental Firstman Declaration.

20  ////

21  ////

22  ////

23  _____

24      [4] It is strongly disputed whether the contract grade referred
to was that in the contract or simply a comparison between the

25  survey done by Baddgor and the survey done by CCS.  TBI cites to
a previous statement by EID that acknowledge that the CCS survey

26  was compared to TBI's survey and not with the as-planned location
of the tunnel.  Ex. 20 to Budwig Dec. at 13:6-10.

## II.

### STANDARDS

Summary adjudication, or partial summary judgment "upon all or any part of a claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim. <u>Lies v. Farrell Lines, Inc.</u>, 641 F.2d 765, 769 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim") (citations omitted); <u>Playboy Enters., Inc. v. Welles, Inc.</u>, 78 F. Supp. 2d 1066, 1073 (S.D. Cal. 1999), <u>aff'd in part, rev'd in part, on other grounds</u>, 279 F.3d 796 (9th Cir. 2002); E.D. Local Rule 56-260(f).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file." <u>Id.</u> Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>See id.</u> at 322. "[A] complete failure of proof concerning

11

an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

1  dispute is genuine, i.e., the evidence is such that a reasonable

2  jury could return a verdict for the nonmoving party, <u>Anderson</u>, 477

3  U.S. 248-49; <u>see also</u> <u>Cline v. Industrial Maintenance Engineering</u>

4  <u>& Contracting Co.</u>, 200 F.3d 1223, 1228 (9th Cir. 1999).

5      In the endeavor to establish the existence of a factual

6  dispute, the opposing party need not establish a material issue of

7  fact conclusively in its favor.  It is sufficient that "the claimed

8  factual dispute be shown to require a jury or judge to resolve the

9  parties' differing versions of the truth at trial."  <u>First Nat'l</u>

10 <u>Bank</u>, 391 U.S. at 290; <u>See also</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

11 Thus, the "purpose of summary judgment is to 'pierce the pleadings

12 and to assess the proof in order to see whether there is a genuine

13 need for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R.

14 Civ. P. 56(e) advisory committee's note on 1963 amendments); <u>see</u>

15 <u>also</u> <u>International Union of Bricklayers & Allied Craftsman Local</u>

16 <u>Union No. 20 v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir.

17 1985).

18     In resolving the summary judgment motion, the court examines

19 the pleadings, depositions, answers to interrogatories, and

20 admissions on file, together with the affidavits, if any.  Rule

21 56(c); <u>See also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1093

22 (9th Cir. 1999).  The evidence of the opposing party is to be

23 believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all reasonable

24 inferences that may be drawn from the facts placed before the court

25 must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475

26 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,

655 (1962)(per curiam)); See also Headwaters Forest Defense v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III.

### ANALYSIS

**A.   DELAY DAMAGES**

The central question raised by defendant's liquidated damages motion is whether the damages objected to by TBI are delay damages within the meaning of that provision of the contract.

The plaintiff argues that a distinction should be made between what the liquidated damages provision covers, simple delay, and damages suffered outside of that provision.  They support this contention by citation to contract provisions recognizing damages recoverable outside the liquidated damages clause, even though they arguably could fall under the "delay" umbrella.

14

**1.** **Corrective Work**

The contract provides two different remedies to EID in the event that the Contractor performs defective work which it does not then correct.  Part 13.09 of the General Contract provides that plaintiff may correct defective work, charging the cost to defendant.[5]  Additionally, if the defective work is discovered within one year of the completion of the Contract, then Section 13.07 provides that the work may be corrected by the Owner at the contractor's expense if the Contractor does not move to make the corrections after seven days written notice.[6]

////

---

[5]  [If] Contractor fails within a reasonable time after written notice of Engineer to proceed and to correct defective Work or to remove and replace rejected Work as required by Engineer in accordance with paragraph 130.6.A, or if Contractor fails to perform the Work in accordance with the contract documents . . . Owner may, after seven (7) days written notice to Contractor, correct and remedy such deficiency. . . All direct and indirect costs of Owner in exercising such rights shall be charged against Contractor in an amount verified by Engineer, and a change order shall be issued incorporating the necessary revisions in the contract documents and a reduction in the Agreement price.  Such direct and indirect costs shall include, in particular but without limitation, compensation for additional professional services required and all costs of repair and replacement of work of others destroyed or damaged by correction, removal or replacement of Contractor's defective Work.  Contractor shall not be allowed an extension of the contract time because of any delay in performance of the Work attributable to the exercise by Owner of Owner's rights hereunder.

Part 13.09 A.

[6]  "Owner may have the defective Work corrected or the rejected Work removed and replaced, and all direct and indirect costs of such removal and replacement, including compensation for additional professional services, shall be paid by Contractor."

Part 13.07.

1    Plaintiff contends that except for the public grant claim, all

2   the challenged damages were incurred by it while remedying the

3   defective work performed by TBI.  As to the damages sought in

4   relation to the public grant, plaintiff maintains they are a result

5   not of the "delay" envisioned in the liquidated damages provision

6   of the contract, but rather due to the additional time that it took

7   to correct and complete the defective work as envisioned by the

8   different provisions in Part 13 of the contract.  As explained

9   below, I conclude that there is a disputed issue of fact as to

10  whether the damages sought relative to the correction of defective

11  work are outside the scope of the liquidated damages clause.  As

12  I also explain, the court concludes that the public grant damages

13  are within the clause.

14    Basic principles of contract interpretation require that the

15  terms of the contract are to be read together.  See Cal. Civ. Code

16  § 1641 ("The whole of a contract is to be taken together, so as to

17  give effect to every part, if reasonably practicable, each clause

18  helping to interpret the other."); In re Crystal Properties, Ltd.,

19  L.P., 268 F.3d 743, 748 (9th Cir. 2001) ("We must interpret the

20  contract in a manner that gives full meaning and effect to all of

21  the contract's provisions and avoid a construction of the contract

22  that focuses only on a single provision . . . .").  The instant

23  contract provides that the "liquidated damages provision shall

24  apply to *all delays of any nature whatsoever*" but the contract does

25  not define what constitutes a "delay." (emphasis added).  As noted

26  above, determining the scope of the term "delay" requires review

1  of the contract as a whole.  Alperson v. Mirisch Co., 250

2  Cal.App.2d 84, 90 (1967) ("even if one provision of a contract is

3  clear and explicit, it does not follow that portion alone must

4  govern its interpretation; the whole of the contract must be taken

5  together so as to give effect to every part.").

6    The broad reading of delay argued for by the defendant would,

7  in effect, undermine, if not nullify, the ability of the plaintiff

8  to seek recovery of correction damages as envisioned in §13.07 and

9  §13.09 since every correction that extended past the original due

10  date would be deemed a delay.  Moreover, by providing a one year

11  "correction period," part 13.07 expressly envisions that the EID

12  may need to make repairs to the project after the completion date,

13  implying that any extra time needed for the corrections would not

14  be considered a delay within the meaning of the liquidated damages

15  clause.[7]  To read the term delay as broadly as defendant maintains,

16  would make sections 13.07 and 13.09 inoperative; a result which

17  contract law disfavors.[8]  City of Atascadero v. Merrill Lynch,

18  Pierce, Fenner & Smith, Inc., 68 Cal.App.4th 445, 473 (1998).

19    The question is thus, what, if any, of the contested damages

20

---

21    [7]  It is disputed whether the Work under the contract was ever
   finished, and if so, when it was.  Accordingly, the court cannot
22  presently resolve whether Part 13.07 or 13.09 applies.

23    [8]  Part 13.09 may also suggest that the correction work was
   not to be considered as delay damages by providing that "if the
24  Contractor fails to perform Work in accordance with the contract
   documents (*including any requirements of the progress schedule*)"
25  that the owner may then remedy the deficiency themselves and seek
   payment from the Contractor for that work.  Section 13.09 (emphasis
26  added).

1  fall under sections 13.09 and 13.07's "direct and indirect" costs
2  language?  Section 13.09's definition of such costs is very broad.
3  See n. 5.  The provision expressly envisions the need to pay for
4  "additional professional services required."  From all that
5  presently appears, EID is seeking compensation for "additional
6  professional services" in the first three contested damage claims.
7  Each of those claims are requests for damages allegedly incurred
8  because plaintiff was required to pay for the additional services
9  of the three companies while the correction work was done on the
10  Tunnel.

11      The compensation sought for loss of public funding is more
12  difficult to categorize.  The damages sought for the first three
13  claims allegedly are direct costs allegedly incurred by virtue of
14  the corrections that had to be made, and, given that they are
15  professional services, they are costs expressly contemplated by the
16  contract.  For the loss of public grant funds, however, EID is not
17  seeking to recover for services that are directly linked to
18  correction work.  Rather, it appears EID seeks compensation for
19  losses allegedly occasioned by the delay.  As to this claim, the
20  contract appears to be ambiguous.  Part 13 allows the owner to
21  collect damages accrued from both direct and indirect costs of
22  making corrections, while the liquidated damages clause says that
23  it shall apply to "all delays of any nature."  The question thus
24  hinges on what the contract intended, in this regard, to include
25  in the "indirect" costs mentioned in 13.07 and/or 13.09.
26  ////

1    Both part 13.07 and 13.09 leave what constitutes an "indirect"

2  damage undefined.  When looking at the contract as a whole, I

3  conclude that the defendant has the better argument on the loss of

4  public funds.  The language in the liquidated damages clause

5  suggests that it was to cover all costs that could be attributed

6  to delay.[9]  Thus, where there is not a provision elsewhere in the

7  contract which provided for recovery of a loss, the plain language

8  in the liquidated damages clause prevails.  EID would be able to

9  collect a maximum of $191,000 under the liquidated damages clause,

10  whereas it is seeking $1.9 million in loss of public grant funds.

11  I conclude that the plain meaning prevails, and plaintiff may not

12  recover the lost public funds grant as a separate damage, but is

13  limited to the liquidated damages provision in that regard.

14    **2.  <u>Termination and Completion</u>**

15    An alternative argument is derived from Part 15.02 of the

16  Contract which provides that EID may terminate the contract if the

17  Contractor "disregards the authority of Engineer," Pt. 15.02(A)(8),

18  or "otherwise violates in any substantial way any provisions of the

19  contract documents." Pt. 15.02(A)(9).  EID claims that it

20  terminated TBI at some point, either prior to or during the time

21  it was undertaking the corrective work.  This contention is

22  disputed.  If there was an effective termination, Part 15.02(B)

23  provides that the Owner may finish the work and states that if the

24  costs of completion exceed the unpaid balance owed the contractor,

25  ────────────────

26    [9]  Part 18 specifically says that the damages for "contractor
delay are expensive to litigate and difficult to ascertain."

1  the "Contractor shall pay the difference to the Owner."  Part

2  15.02(B).[10]  It further provides that "where Contractor's services

3  have been so terminated by Owner, the termination shall not affect

4  any rights of Owner against Contractor then existing or which may

5  thereafter accrue."  Part 15.02(C).

6      This provision further appears to permit recovery for the

7  first three contested damages.  EID claims that it terminated TBI's

8  right to proceed under the contract on July 16, 2003, or, at the

9  latest, on March 31, 2004.  The contract's plain meaning provides

10  that any costs incurred after the termination date that are

11  connected with completing the project work are recoverable.  Thus,

12  defendant's summary judgment motion must be denied as to the first

13  three contested damages, and granted as to the public funds

14  claim.[11]

15  ───────────────────

16      [10]  "If the unpaid balance of the Agreement price exceeds the
     direct and indirect costs of completing the Work, including
17  compensation for additional professional services, such excess
     shall be paid to the Contractor.  If such costs exceed such unpaid
18  balance, Contractor shall pay the difference to Owner.  Such costs
     incurred by Owner shall be verified by Engineer and incorporated
19  in a change order, but in finishing the Work, Owner shall not be
     required to obtain the lowest figure for the Work performed."  Part
20  15.02(B).

21      [11]  In a footnote in their reply brief, defendant argues that
     the damages for "lost power sales" should also be stricken.  Reply
22  papers are generally limited to matters in the opposition papers.
     It is improper for the moving party to "shift gears" and introduce
23  new facts, different legal arguments and particularly new motions
     than were presented in the moving papers.  See Lujan v. National
24  Wildlife Federation 111 L.Ed.2d 695, 721 n.5 (1990)(court has
     discretion to disregard late-filed factual matters); Ira A. Brown
25  and Robert I. Weil, California Practice Guide: Civil Procedure
     Before Trial at 12:106.  The court will not address the damages for
26  lost power sales in this order.

1  **B.    FALSE CLAIMS ACT**

2      **1. <u>The Applications for Payment and Supporting Documentation</u>**

3          The primary issue relative to the False Claims Act causes of

4  action is whether TBI submitted a "false claim" within the meaning

5  of the Act.  Although plaintiff relies on the applications for

6  payment submitted by the defendant to EID, it does not rely on any

7  actual language in the Payment Applications themselves.  Instead,

8  EID asks the court to take a number of steps from those

9  applications, to their attachments, to the contract and then even

10  within the contract before the court could reach the conclusion

11  that there was a false statement.  Put directly, the path is too

12  long, and the argument is too attenuated.  Below, I follow the long

13  road traversed by plaintiff's argument.

14          The applications for payment submitted by TBI contain little

15  content.  They note that a "Schedule of Values" spreadsheet for the

16  month in question is attached.  Erdman Dec., Exs. A-K.  Some

17  applications include one or two lines of "notice" about certain

18  items which have been amended according to change orders.  <u>Id.</u>

19  Most say that the costs for Item 12a are based on time and material

20  expenditures, and they all have a line that states when payment is

21  due and that the "total amount due includes all money earned minus

22  10% retainage minus all payments made to date."  <u>Id.</u>  There is

23  simply no statement on the face of the applications which specifies

24  that the Tunnel has been constructed up to the time covered by an

25  application to meet the line, grade and tolerances which are in the

26  ////

1   design documents.[12]

2        The plaintiff then turns to the schedule of values which is

3   attached to the applications for payment.  It contains a list of

4   various construction tasks, such as "Perform Access Road and Site

5   Improvements" and "Furnish & Install Rock Bolt Supports."  Id.

6   These are then followed by columns which list the quantity, the

7   Unit, the Unit Price, the Total Contract Amount, Percent Complete

8   to Date, and the Total Earned to Date, along with a break down for

9   each month of what was completed and the dollars that were earned.

10  Id.

11       One of the items in the attachment, number 24, is "Excavate

12  Tunnel" of which there is a quantity of 10,132 (apparently the

13  expected length of the tunnel in feet) with a unit price of

14  $317.00.  Id.  Rather than including a percent completed like the

15  other listed items, the column just indicates the number of feet

16  drilled.  Id.  That number appears to be multiplied by the unit

17  price to get the total earned to date.  Id.  Generally, the term

18  "work" does not appear at all in the schedule of values, and if it

19  does it is in the sense of "road work" or "delay in work."  Id.

20       EID then directs the court to Part 14 of the contract which

21  addresses the "Payments to Contractors and Completion."  Part 14.01

22  provides that prior to submitting the first application for a

23  progress payment the "schedule of values of the Work" was to be

24  approved by the Engineer.  Part 14.03 then continues that

25  _____

26       [12] The court notes that there is dispute about whether the
     design documents are actually part of the contract.

"Contractor shall submit to Engineer for review an application for partial payment completed and signed by Contractor covering the Work completed as of the date of the application and accompanied by such supporting documentation as is required by the contract documents and also as Engineer may reasonably require." EID claims that this language, which requires the payment applications to cover the "Work completed as of the date of the application," is the certification needed to make the payment applications false claims.

The conclusion that there has been a false claim, however, requires resort to yet other part of the contract. Part 1 of the contract defines the term Work to mean: "The entire completed construction of the various separately identifiable parts thereof required to be furnished under the contract documents. Work is the result of performing services, furnishing labor and furnishing and incorporating materials and equipment into the construction, all as required by the contract documents." This, plaintiff claims, demonstrates that the payment claims certified that the tunnel excavations were in accordance with the design specifications.

To summarize, the contract defines Work to mean the performance of services "as required by the contract documents," the contract requires that the applications for payment be submitted to cover "the Work completed," and the payment applications that were thus submitted, EID claims, certified that they were for work completed as required by the contract documents. The problem with plaintiff's argument is that, despite the effort,

23

1  the court simply does not find that the circumstances justify a

2  conclusion that the Payment Applications meet the statutory

3  definition of a false claim.

4      **2.  <u>Was there a False Claim?</u>**

5       The statute defines a claim as follows:

6       "Claim" includes any request or demand for money,
        property, or services made to any employee, officer, or
7       agent of the state or of any political subdivision, or
        to any contractor, grantee, or other recipient, whether
8       under contract or not, if any portion of the money,
        property, or services requested or demanded issued from,
9       or was provided by, the state (hereinafter "state
        funds") or by any political subdivision thereof
10      (hereinafter "political subdivision funds").

11  Cal. Gov't Code § 12650(b)(1). TBI argues that the claim that they

12  submitted, i.e., the payment applications, were not false because

13  they accurately requested payment for the number of feet excavated

14  and nothing more.  Although the excavation was conducted at the

15  wrong angle, TBI argues that all the claim for payment asserted was

16  that the Contractor had excavated a certain number of feet at the

17  time the request for payment was submitted.  EID, however, says

18  that the schedule of values as defined in the contract was not

19  meant to merely indicate the excavation of a certain number of

20  feet, rather a certain number of feet excavated in compliance with

21  the contract documents, which they reason includes the design

22  documents.

23      As defendant maintains, the payment applications, <u>vel</u> <u>non</u>, do

24  not state that they are seeking payment for excavations at a

25  certain line or grade.  Nonetheless, the court must determine

26  whether these statements falsely certified that they were in

24

1   compliance with the contract design documents.

2       Neither the parties' briefs, nor the court's own research,

3   has revealed any authority directly addressing how far from the

4   actual claim a court should go before finding a false statement

5   underlying the cause of action.  The cases discussed below,

6   however, provide some guidance.

7       EID points to a Tenth Circuit case where the court found that

8   there was a violation of the federal False Claims Act when the

9   document which constituted the claim was not directly false, but

10  was dependent upon underlying documents which were false.  See Shaw

11  v. AAA Engineering & Drafting, Inc., 213 F.3d 519, 530 (10th Cir.

12  2000).[13]  In Shaw, the company had falsified work orders in order

13  to make it appear that more work had been done by the company than

14  had actually been performed.[14]  The court found that "[s]imply

15  because the production quantities recorded on the work orders did

16  not determine the exact amount of the settlement does not eradicate

17  a connection between the work orders and the equitable adjustment."

18  Id.  The path from the request for an equitable adjustment in that

19  _____

20  [13]  The California courts recognize that the state's False
    Claims Act is patterned on the federal statute, see City of Pomona
21  v. Superior Court, 89 Cal.App.4th 793, 801 (2001), and thus in the
    absence of California authority, state courts may look to federal
22  cases for guidance as to the proper construction of the statute.

23  [14]  The company sought an equitable adjustment to the contract
    amount they had with the government on the grounds that they were
24  performing more work than had been expected under the contract.
    The primary source of proof were falsified work orders.  Id. at
25  524-27.  Prior to the fraud being discovered, the government
    increased funding up to the amount it would have cost the company
26  to hire one and a half new workers to handle the asserted increased
    work load.

1   case and the work orders was direct, however, and the path in the

2   instant case is considerable more extended and altogether less

3   plainly connected.   In <u>Shaw</u>, the company had actually altered the

4   work orders, making their "false" nature apparent.   In this case,

5   there is no proof presented of a specific act of falsification in

6   the payment applications or in anything the company relied on.

7   Thus, <u>Shaw</u> does not provide direct support for plaintiff's claim.

8        In a case from Hawaii, a district court found no "false claim"

9   where bills were submitted for payment for medical services

10  provided even though in providing those services the company had

11  violated federal law by charging a co-payment to the indigent

12  customers to whom it was providing services.   <u>Lum v. Vision Service

13  Plan</u>, 104 F.Supp.2d 1237, 1240-41 (2000).   Although the law forbade

14  the charging of a co-payment, the court concluded that the bills

15  submitted to the government were not false because the billings did

16  not impose the co-payment nor did they promise compliance with the

17  law.   <u>Id.</u>   The court held that "violations of laws, rules, or

18  regulations alone do not create False Claims Act liability." <u>Id.</u>[15]

19  ─────────────────────

20        [15] Although the court's holding does not, in terms, extend to
    violations of a contract provision, there does not appear to be any
21  logical reason to distinguish between the violation of the law in
    <u>Lum</u> versus the violation of a contract here.   The cases and the
    legislative history of the federal False Claims Act indicate that
22  the Act was not meant to be a catch-all provision for the violation
    of any law.   The same should apply for contracts where contract law
23  itself provides an adequate remedy.   <u>See</u>, <u>e.g.</u>, <u>Lum v. Vision
    Service Plan</u>, 104 F.Supp.2d at 1241-42 (holding that there are
24  other remedies for regulatory violations and that the FCA should
    not be used unless there is an express false certification);   <u>and
25  see</u> <u>Mikes v. Straus</u>, 274 F.3d 687, 699 (2d Cir. 2001) (stressing
    that the FCA was not "designed for use as a blunt instrument to
26  enforce compliance" with all regulations, rather only those that

                                    26

1    <u>Lum</u> relies upon a Ninth Circuit case which holds that a

2    violation of law without more does not rise to liability under the

3    FCA; rather, there must be an actual false certification of

4    compliance with the law to impose liability under a false

5    certification theory. <u>U.S. ex rel. Hopper v. Anton</u>, 91 F.3d 1261,

6    1266 (9th Cir. 1996).

7    In the matter at bar, the section on the application for

8    progress payments states that the applications shall cover the

9    "[w]ork completed." Thus, there does not appear to be a

10   requirement of direct certification that the work complied with the

11   design documents. The lack of a requirement for direct

12   certification in the contract thus would seem to preclude liability

13   predicated upon presenting a false claim. Nonetheless, another

14   premise for liability is contained in the False Claims Act.

15   Under sections 12651(a)(1) and (2), liability may also be

16   predicated upon knowingly causing a false claim to be presented or

17   made. I turn to whether there is a viable claim under this

18   "causing" provision.

19   Part 14.05 of the contract requires that the Engineer review

20   the Payment Applications prior to recommending payment. The

21   section provides that the Engineer's recommendation "will

22   constitute a representation by Engineer to Owner . . . that the

23   Work has progressed to the point indicated; that, to the best of

24   Engineer's knowledge, information and belief, the quality of the

25   _____

26   are a precondition to payment.); S. Rep. No. 99-345, at 9 (1986).

27

1 Work is in accordance with the contract documents." While the
2 provision may be read as supporting the proposition that the
3 applications for payment caused the Engineer to certify that the
4 excavation was done in compliance with the contract documents, it
5 then deviates from a true false claim predicate since it limits
6 certification to the Engineer's knowledge rather than objective
7 fact. Moreover, later language further qualifies the effect of the
8 certification by providing that the Engineer's recommendation "will
9 not be deemed to have represented that exhaustive or continuous on-
10 site inspections have been made to check the quality or quantity
11 of the Work, or that the means, methods, techniques, sequences, and
12 procedures of construction have been reviewed . . . ."

13     Chief Judge Levi recently held that "[t]he prevailing law is
14 that 'regulatory violations do not give rise to a viable FCA
15 action' unless government payment is expressly conditioned on a
16 false certification of regulatory compliance." U.S. ex rel. Swan
17 v. Covenant Care, Inc., 279 F.Supp.2d 1212, 1221 (E.D. Cal. 2002);
18 Lum v. Vision Service Plan, 104 F. Supp. 2d 1237, 1242 (D. Haw.
19 2000) ("[a]bsent express false certifications upon which funding
20 is conditioned, the False Claims Act provides no remedy"). As I
21 indicated above, I can conceive no reason to give greater weight
22 to contract provisons than duly-adopted regulations. Given the
23 qualifying language, the court cannot find an express statement of
24 compliance with the design documents, nor any clearly false
25 information in the applications for payment themselves.
26 ////

1              **a.**   <u>**Implied Certification**</u>

2      EID argues an alternate theory, "implied certification," which

3 would impose a lower hurdle for liability. As I explain below,

4 there is a dispute among the circuits as to whether or not an

5 implied certification suffices to support a cause of action under

6 the False Claims Act.

7      In <u>Swan</u>, the court included a footnote which observed that it

8 had previously "rejected plaintiffs' implied certification theory,

9 noting that the Ninth Circuit has not adopted the implied

10 certification theory of FCA liability recognized by some courts."

11 279 F.Supp.2d at 1216, n. 3. A number of other courts have also

12 concluded that the Ninth Circuit has not adopted an implied

13 certification theory. <u>See</u> <u>Lum v. Vision Service Plan</u>, 104

14 F.Supp.2d at 1241-42; <u>U.S. ex rel. Hopper v. Anton</u>, 91 F.3d 1261,

15 1267 (9th Cir. 1996) ("For a certified statement to be 'false'

16 under the Act, it must be an intentional, palpable lie. Innocent

17 mistakes, mere negligent misrepresentations and differences

18 in interpretations are not false certifications under the Act."

19 (internal citations omitted)); <u>U.S. ex rel. Graves v. ITT</u>

20 <u>Educational Services, Inc.</u>, 284 F.Supp.2d 487, 497 (S.D. Tex. 2003)

21 ("The Fifth Circuit, with the Second, Fourth, Ninth, and District

22 of Columbia Circuits, has held that a claim under the False Claims

23 Act is 'legally false' only where a party affirmatively certifies

24 compliance with a statute or regulation as a condition to receiving

25 governmental payment or property"); <u>see</u> <u>also</u> <u>Shaw v. AAA</u>

26 <u>Engineering & Drafting, Inc.</u>, 213 F.3d at 532 (10th Cir. 2000)

1   (citing Ninth Circuit cases the court found that "[n]ot all courts
2   have embraced the theory that an FCA suit may be based on an
3   implied certification.").

4        Despite the weight of authority to the contrary, one case from
5   the Central District of California has recently found that the
6   implied certification theory was consistent with the legislative
7   history surrounding the federal FCA.   U.S. ex rel. Holder v.
8   Special Devices, Inc., 296 F.Supp. 2d 1167, 1176 (C.D. Cal. 2003).
9   The court found that Hopper (the only Ninth Circuit case cited in
10  the list above and the one upon which most of the other cases rely)
11  did not actually reach the question of implied certification.   Id.
12  at 1176. It is true that it is difficult to resolve whether the
13  court in Hopper was focusing on the lack of a certification or the
14  lack of a requirement for certification. Id. at 1266.[16]
15  Nonetheless, the Hopper court does emphasize that "[m]ere
16  regulatory violations do not give rise to a viable FCA action"
17  particularly where "regulatory compliance was not a sine qua non
18  of receipt of state funding."   Id.

19       Holder distinguished Hopper's statements requiring an express
20  certification largely on the ground that the legislative history
21  of the federal act intended to allow implied certification claims.
22  Without entering the thicket of debate about when it is appropriate
23  to consult legislative history, I note that the legislative history

24  _____

25       [16]  The court said that the "forms do not contain any
    certification concerning regulatory compliance." Hopper, 91 F.3d
26  at 1267.

                                  30

1  cited is far from clear on the subject.[17]  Both <u>Holder</u> and <u>Shaw</u>

2  rely on a Senate Committee report stating that a false claim under

3  the FCA "may take many forms, the most common being a claim for

4  goods or services not provided, or provided in violation of

5  contract terms, specification, statute, or regulation."  S. Rep.

6  No. 99-345, at 9 (1986).  This language may demonstrate an intent

7  that the federal FCA address claims relating to both the number of

8  services provided and the content of the services; it does not,

9  however, provide any insight into the clarity required in the claim

10 itself.

11      Moreover, this court finds persuasive the reasoning of the

12 <u>Hopper</u> court that there are "administrative and other remedies for

13 regulatory violations," and of course the same may be said for

14 contract violations as well.  Contrary to plaintiff's contention

15 at oral argument, the congressional history does not suggest that

16 the violation of contract terms should be treated differently than

17 violations of laws or regulations which bind those seeking payment

18 from the government.  I conclude that, even assuming the propriety

19 of resort to legislative history, that history (upon which <u>Holder</u>

20 relies) is not clear enough to require this court to depart from

21 the weight of authority holding that the Ninth Circuit has

22 rejected implied certification claims.

23 ////

24 _____

25     [17]  It should also be remembered that it is legislative
   history of the federal and not the state act.  There is nothing to
26 indicate that the state legislature was aware of the cited history
   and relied on it in adopting the state statute.

1    Hence, finding that no implied false certification theory

2  exists in this circuit, the court finds that there was no false

3  claim submitted in the applications for payment.[18] Indeed, an

4  implied certification doctrine has the potential to open the door

5  to a flood of cases involving no more than breaches of contract.

6  It seems unlikely that the legislature intended to make

7  construction contractors on periodic payments potentially liable

8  under the FCA for all deviations from contract specifications.

9  Under such a regimen, the parties would litigate whether vague

10  provisions in the contract and ambiguous statements in the claim

11  for payment add up to a false claim.  There appears to be no reason

12  to elaborate simple contract violations into potential claims for

13  compensation under the state's False Claims Act, especially given

14  California's broad fraud jurisprudence.[19]

15  **C.    FRAUD**

16    The elements of common law fraud in California are "(a)

17  misrepresentation (false representation, concealment or

18  nondisclosure), (b) knowledge of falsity, (c) intent to defraud,

19  i.e., intent to induce reliance, (d) justifiable reliance; and (e)

20  resulting damage."  B.E. Witkin, <u>Summary of California Law</u>, 9th

21  Ed., Vol. 5, Torts, § 676.  TBI seeks to have the fraud cause of

22  action dismissed on the grounds that there is no false statement

23

24    [18]  This finding extends to the causes of action brought under
all three of the different FCA sections since they all require a
false claim of some sort.

25

26    [19]  Of course, the project owner who desires exact information
can require a direct and unambiguous certification.

32

1  in the Payment Applications.  EID seeks to have the court establish

2  only the first two elements of the fraud claim at this time:

3  misrepresentation and knowledge of falsity.

4         A recent decision by the California Supreme Court guides

5  review of the instant fraud claim.  In Robinson Helicopter Co.,

6  Inc. v. Dana Corp., the Court reviewed a breach of contract case

7  in which intentional and negligent misrepresentation claims were

8  also brought. 34 Cal.4th 979, 991-92 (2004).  The Court explained

9  that ordinarily under California's public policy tort causes of

10 action should be disallowed where there is an available contract

11 remedy.  "Courts will generally enforce the breach of a contractual

12 promise through contract law, except when the actions that

13 constitute the breach violate a social policy that merits the

14 imposition of tort remedies." Id. (internal quotations omitted).

15 The court concluded, however, that fraud allegations in contract

16 cases present a different issue since they deal with intentional

17 misrepresentations constituting an extra layer of blameworthiness

18 Id.

19        Unlike FCA claims, California's common law fraud doctrine does

20 not require an express representation, but fraud may be implied by

21 or inferred from the circumstances. Universal By-Products, Inc. v.

22 City of Modesto, 43 Cal.App.3d 145, 151 (1974).  All that is

23 required is that "the misrepresentation must be a material and

24 knowingly false representation of fact." Orient Handel v. United

25 States Fid. & Guar. Co., 192 Cal.App.3d 684, 693 (2d. Dist. 1987).

26 ////

1        Again, in the matter at bar, the Payment Applications

2   themselves do not state anything which is untrue on their face.

3   Nonetheless, it is possible that a reasonable jury might conclude

4   from the totality of the circumstances that the payment

5   applications implied that the work was proceeding in accordance

6   with the design documents.[20]

7        As noted earlier, the June 11, 2002 meeting minutes state

8   "California Construction Services [is] to finish Survey check of

9   tunnel vertical control.  Findings [are] to be confirmed but

10  preliminary report shows they closed loop and matched TBI survey

11  of tunnel alignment and grade within a 1-1/4 inch."  Supp. Firstman

12  Dec., Ex. F.  EID argues that this language is a misrepresentation

13  that the tunnel was only 1 1/4 inches off, while TBI argues that

14  the minutes clearly note only that the CCS survey confirmed the

15  results of the TBI survey within 1 1/4 inches, not that the actual

16  grade was within 1 1/4 inches of the as-planned alignment. EID

17  responds pointing to the McDonald deposition where the witness

18  testified that it was his opinion that most people in the industry

19  would think it was a comparison to the as-planned alignment and not

20  merely a comparison of two surveys.  McDonald McDonald at 290-

21  ////

22  ─────────────────

23       [20]  Defendant at oral argument raised the need for plaintiff
     to have plead the specific instances of fraud.  As a result, there
     is currently pending a motion to amend the complaint which may
24   allow the plaintiff to specifically add the June 11th statements
     to their fraud cause of action.  In the meantime, the court will
25   discuss the June 11th statements as they were elucidated in the
     summary judgment briefing and at oral argument as they appear to
26   raise, at a minimum, issues of disputed fact.

                                    34

1  291.[21]  They also point to a letter from MWH dated June 18, 2002

2  which notes that "California Construction Services (CCS) has not

3  completed reducing survey notes to verify TBI's horizontal and

4  vertical alignment control survey of new tunnel.  However, spot

5  review indicates CCS is within 0.10 foot (1 1/4") of TBI's survey

6  control."  Stump Dec., Ex. C.  Close reading of that language,

7  however, suggests that it share the same ambiguity found in the

8  June 11 minutes.

9       TBI points to contentions filed by EID in support of a

10  discovery motion before Judge Hollows.  There EID argued "[a]t the

11  District's prodding, TBI hired an independent expert, California

12  Construction Services ("CCS"), to measure grade and alignment in

13  the Tunnel after construction was well underway.  The District

14  received only partial results from CCS's survey during

15  construction, that compared CCS' as built survey, *but did not*

16  *compare either survey with the as-planned location of the Tunnel*."

17  Ex. 20 to Budgwig Dec. at 13:6-10 (emphasis added).

18      All the above simply demonstrates that there is a triable

19  issue of fact regarding what the June 11, 2002 meeting minutes

20  meant, and a dispute about whether under the circumstances the

21  applications for payment were fraudulent.  Thus, summary judgment

22  on the fraud claim is denied for both parties.

23  ////

24  
25      [21]  Whether or not the testimony constitutes an admission,
    defendant can hardly claim that McDonald was unqualified to
    express such an opinion, given the witness' function relative to
26  the construction of the tunnel.

35

1    The other question that EID would have the court resolve is

2    whether there was sufficient knowledge of the tunnel misalignment

3    to meet the second fraud prong.  In conformity with the above

4    analysis, there is a triable issue as to whether TBI knew that

5    their applications for payment were fraudulent, even if they knew

6    that the tunnel was misaligned.  As the leading text on California

7    law puts it, "ambiguous statements, with a possible true or false

8    meaning, are fraudulent only if the false meaning was intended, or

9    if the statement was made with either reckless indifference as to

10   how it would be interpreted or without any belief as to how it

11   would be understood."  B.E. Witkin, Summary of California Law, 9th

12   Ed., Vol. 5, Torts, § 704 (citing Restatement (Second) of Torts

13   § 527).  Under the present record, it is clear that they are

14   contested issues of fact which must be resolved by the jury.[22]

**IV.**

**ORDERS**

17   For all the foregoing reasons, the court hereby ORDER as

18   follows:

19   1.  Summary Judgment is DENIED to defendant with respect to

20   the following damages:

21   A.   $1,538,313.00 for MWH's extended project

22   management services beyond the contractual completion date;

23   ////

---

25   [22]   There is also a triable issue about whether EID had
knowledge of the misalignment, but that would likely fall under the
26   fourth prong of "justifiable reliance."

36

1          B.    $252,485.00 for EN2's extended environmental

2    monitoring services;

3          C.    $1,571,888.00 for HPT's extended water treatment

4    services;

5      2.  Summary Judgment is GRANTED to defendant with respect to

6    the $1,901.333.00 for loss of public grant funds due to delay in

7    completion;

8      3.   Summary judgment is GRANTED to defendant on all of the

9    False Claims Act causes of action (second through eleventh) and

10   DENIED to plaintiff; and

11     4.  Summary judgment is DENIED to both parties relative to the

12   fraud cause of action.

13     IT IS SO ORDERED.

14     DATED:  October 5, 2005.

15
                            /s/Lawrence K. Karlton
16                          LAWRENCE K. KARLTON
                            SENIOR JUDGE
17                          UNITED STATES DISTRICT COURT

18

19

20

21

22

23

24

25

26

37